**CT Corporation**

**Service of Process Transmittal**
09/26/2011
CT Log Number 519211964

TO: Kip Washington, Paralegal
Computer Sciences Corporation
3170 Fairview Park Drive
Falls Church, VA 22042-

RE: **Process Served in Virginia**

FOR: Computer Sciences Corporation (Domestic State: NV)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Che Wu Hung, etc., Pltf. vs. Michael W. Laphen, et al. including Computer Sciences Corporation, Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Fairfax County Circuit Court, VA<br>Case # CL20110013376 |
| **NATURE OF ACTION:** | Alleges breach of fiduciary duties |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Glen Allen, VA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 09/26/2011 at 08:45 |
| **JURISDICTION SERVED :** | Virginia |
| **APPEARANCE OR ANSWER DUE:** | Within 21 days after service |
| **ATTORNEY(S) / SENDER(S):** | Che Wu Hung<br>Finkelstein Thompson LLP<br>1050 30th Street NW<br>Washington, DC 20007<br>202-337-8000 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/26/2011, Expected Purge Date: 10/01/2011<br>Image SOP<br>Email Notification, William Deckelman wdeckelman@csc.com<br>Email Notification, Kip Washington kwashington6@csc.com<br>Email Notification, Tracy Good tgood2@csc.com |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:**<br><br>**TELEPHONE:** | C T Corporation System<br>Tinika Baylor<br>4701 Cox Road<br>Suite 301<br>Glen Allen, VA 23060<br>804-217-7255 |

Page 1 of 1 / DJ

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

COMMONWEALTH OF VIRGINIA
## *CIRCUIT COURT OF FAIRFAX COUNTY*
**4110 CHAIN BRIDGE ROAD**
**FAIRFAX, VIRGINIA 22030**
**703-691-7320**
(Press 3, Press 1)

Che Wu Hung vs. Michael W Laphen, etal.

CL-2011-0013376

**TO:**   Computer Sciences Corp
Nominal Defendant
Serve:  CT Corp System
4701 Cox Rd Suite 301
Glen Allen VA  23060

## SUMMONS – CIVIL ACTION

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

Done in the name of the Commonwealth of Virginia, on Tuesday, September 20, 2011.

**JOHN T. FREY, CLERK**

By: _____
**Deputy Clerk**

**Plaintiff's Attorney**  Robert Wilson

**VIRGINIA:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY



FILED
CIVIL INTAKE
2011 SEP 13 PM 1:30
JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

CHE WU HUNG, derivatively, on behalf of
COMPUTER SCIENCES CORPORATION,

Plaintiff,

MICHAEL W. LAPHEN, MICHAEL J.
MANCUSO, DAVID J. BARRAM, STEPHEN
L. BAUM, ERIK BRYNJOLFSSON,
RODNEY F. CHASE AND THOMAS H.
PATRICK,

Defendants,

- and -

COMPUTER SCIENCES CORPORATION.
Serve:  CT Corporation System
       4701 Cox Road, Suite 301
       Glenn Allen, Virginia 23060-6802

Nominal Defendant.

CL-        **2011-13376**

## COMPLAINT

COMES NOW Plaintiff Che Wu Hung, by counsel, and for his complaint alleges as

follows upon information and belief, except as to allegations contained in paragraph 10, which

are based upon personal knowledge:

## NATURE OF THE ACTION

1.        This is a shareholder derivative action for breach of fiduciary duty brought on

behalf of nominal defendant Computer Sciences Corporation ("CSC" or the "Company")

against the Company's Chief Executive Officer, Chief Financial Officer, and members of the

1

Audit Committee of the Company's board of directors. These defendants comprised a majority of the Company's board of directors (6 out of 10) at the time this action was filed.

2.      CSC offers information technology ("IT") implementation and consulting services to private business and government entities. On November 10, 2010, CSC announced quarterly earnings for the second quarter of fiscal year 2011, and revealed that certain accounting irregularities had been discovered in the Company's Nordic Region, which would require a $40 million charge. However, CSC's officers assured shareholders that the accounting problems had been fixed and increased projections for the Company's bookings for fiscal year 2011 by $500 million to $18.5 billion due to a "solid quarter in new business bookings." They also boosted fiscal year 2011 earnings per share forecasts to $5.45, stating that they were "bullish" on the fiscal year. These defendants also assured shareholders that, despite several delays and setbacks, CSC's multi-billion dollar contract with the U.K.'s National Health Service ("NHS") would continue to contribute to the Company's margins.

3.      However, beginning on or about February 1, 2011 and extending through at least June 15, 2011, CSC issued a series of startling disclosures dramatically decreasing the Company's actual and projected performance, and "adjusting" previously reported 2010 financial results due to accounting fraud. These disclosures revealed that the Company's earlier financial projections had been without basis, and that, contrary to its public filings, the Company's internal audit and disclosure control environment was materially degraded.

4.      On February 1, 2011, CSC disclosed that, far from being fixed and behind the Company, the U.S. Securities and Exchange Commission ("SEC") had commenced a formal investigation into the Company's accounting irregularities. Just a week later, on February 9, 2011, the Company revealed that bookings for fiscal year 2011, projected to *increase* by $500 million to $18.5 billion just a few months earlier, would be slashed by a shocking **$2.5 billion**. The Company revealed that the previously identified accounting irregularities would require a charge of over $80 million, double the amount disclosed just a few months prior. Finally, the

Company disclosed that the U.K. government had threatened to terminate its contract with CSC due to delays, raising the prospect of materially reduced contract value.

5. Then, on May 2, 2011, the Company disclosed that bookings for fiscal year 2011 would be reduced by an additional **$2 billion** from previously reduced fiscal year 2011 bookings, resulting in a total decrease of **$4.5 billion** in just a matter of months. On May 25, 2011, CSC revealed that the Audit Committee of its board had commenced its own investigation into the accounting irregularities, that additional accounting issues had been discovered, and that the filing of the Form 10-K for fiscal year 2011 would be delayed, demonstrating that the internal control breakdowns were far more serious than had been let on. CSC also revealed dramatically lower earnings per share for fiscal year 2011. Contrary to their earlier denials, defendants finally admitted that CSC's reduced performance was caused in part by problems with the NHS contract and the accounting scandal.

6. On June 15, 2011, the Company filed a Form 10-K with the SEC, reporting that it had been forced to make "adjustments" to its fiscal year 2011 results due to "intentional misconduct" by executives in the Company's Nordic Region, and that operating income for fiscal year 2010 had been overstated by $53 million. The Form 10-K further admitted that the very internal control problems which led to the "adjustments" had been existed as of April 2010, more than a year before they were disclosed. Yet throughout fiscal years 2010 and 2011, defendants assured shareholders in SEC filings that the Company's internal controls were adequate, and that the financial statements were true and complete.

7. As the Company's senior executives and members of its Audit Committee, the Individual Defendants are responsible for the Company's internal control environment, including its financial guidance to shareholders and all of the Company's disclosure and internal audit controls. In breach of their fiduciary duties, defendants made assurances to shareholders that the Company's financial projections and reports were accurate, and that the Company's internal controls were adequate, when they were not.

3

8.     Defendants have damaged CSC. A dramatic decrease in the Company's share price following these revelations has exposed the Company to massive liability for securities fraud in class action lawsuits being pursued in the U.S. District Court for the Eastern District of Virginia against CSC by a large institutional investor. Due to defendants' breaches, the Company has been exposed to SEC penalties, substantial defense and investigation expenses in connection with the Audit Committee and SEC investigations, and reputational harm.

## JURISDICTION

9.     This Court has subject matter jurisdiction over this matter pursuant to Virginia Code § 17.1-513 because Plaintiff seeks to recover money of greater value than $100, and pursuant to Virginia Code § 8.01-610, because Plaintiff seeks injunctive relief. This Court has personal jurisdiction over each defendant named herein pursuant to Virginia Code § 8.01-328.1(A)(1), because this matter arises from each defendant's transaction of business in this Commonwealth.

## PARTIES

**Plaintiff**

10.     Plaintiff Che Wu Hung purchased shares of CSC on or about March 11, 1998, and has continuously held CSC shares since that time.

**Nominal Defendant CSC**

11.     Nominal defendant CSC is a Nevada corporation with its principal executive offices located at 3170 Fairview Park Drive, Falls Church, Virginia. CSC is one of the world's largest providers of IT services. The Company's shares are publicly traded on the New York Stock Exchange under the stock symbol CSC. CSC describes itself as one of the world's largest and most respected providers of information technology services. CSC operates three lines of business: (1) business solutions and services ("BBS"), (2) managed services ("MSS"), and (3) North American public sector ("NPS").

4

**Individual Defendants**

12.     Defendant Michael W. Laphen ("Laphen") is and was throughout the relevant period CSC's President, Chief Executive Officer and Chairman of the Board of Directors. In fiscal year 2010, Laphen was paid over $15 million in cash and stock compensation. In fiscal year 2011, Laphen was paid $12.5 million in cash and stock compensation.

13.     Defendant Michael J. Mancuso ("Mancuso") is and was throughout the relevant period CSC's Vice President and Chief Financial Officer. In fiscal year 2010, Mancuso was paid over $3 million in cash and stock compensation. In fiscal year 2011, Mancuso was paid $2.9 million in cash and stock compensation.

14.     Defendant David J. Barram ("Barram") has been a director since 2004, and served as a member of CSC's Audit Committee at all relevant times. In fiscal year 2010, Barram was paid $229,878 in cash and stock compensation. In fiscal year 2011, Barram was paid $244,750 in cash and stock awards.

15.     Defendant Stephen J. Baum ("Baum") has been a director since 1999 and served as a member of CSC's Audit Committee at all relevant times. In fiscal year 2010, Baum was paid $258,264 in cash and stock compensation. In fiscal year 2011, Baum was paid $258,396 in cash and stock awards.

16.     Defendant Erik Brynjolfsson ("Brynjolfsson") has been a director since 2010 and served as a member of CSC's Audit Committee at relevant times. In fiscal year 2011, Brynjolfsson was paid $123,283 in cash and stock awards.

17.     Defendant Rodney F. Chase ("Chase") has been a director since 2001 and served as a member of CSC's Audit Committee at all relevant times. In fiscal year 2010, Chase was paid $236,433 in cash and stock awards. In fiscal year 2011, Chase was paid $252,750 in cash and stock awards.

18.     Defendant Thomas H. Patrick ("Patrick") has been a director since 2004 and served as a member of CSC's Audit Committee at all relevant times. In fiscal year 2010,

.5

Patrick was paid 215,322 in cash and stock awards. In fiscal year 2011, Patrick was paid $226,750 in cash and stock awards.

19.     Defendants Laphen, Mancuso, Barram, Baum, Brynjolfsson, Chase and Patrick are sometimes collectively referred to as "the Individual Defendants." At the time this action was filed, all of the Individual Defendants (except Mancuso) served on the Board of Directors of CSC.

20.     At all relevant times herein mentioned, each of the Individual Defendants was the agent, principal, representative, and/or employee of each of the other Individual Defendants, and, in their conduct herein alleged, was acting within the scope of said agency, representation, and/or employment with permission of each Individual Defendant.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

21.     Each of the Individual Defendants, by virtue of his CSC management, executive, and/or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related thereto.  The Individual Defendants were required to exercise reasonable care and supervision over the dissemination of information concerning the business, operations, and financial reporting of CSC.

22.     The Individual Defendants were required to supervise the preparation of CSC's public filings and approve any reports, such as press releases and SEC filings, concerning CSC's financial condition and internal accounting controls.

23.     Each of the Individual Defendants directly participated in the management of the Company and/or was involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements alleged herein, and/or was aware that the false and misleading statements were being issued regarding the Company's financial position and approved or ratified these statements.

24.     Because of each of the Individual Defendants' positions with CSC, each knew and had access to non-public information about the business of CSC, as well as its finances and accounting procedures, via access to internal corporate documents, conversations and

connections with other corporate officers and employees, attendance at management and/or board of directors' meetings and committees thereof, and reports and other information provided in connection therewith.

25.      Because of their positions and access to material non-public information, each of the Individual Defendants knew or disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were false and misleading.

26.      Because of their positions as directors and/or officers of CSC, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

27.      To discharge their duties as corporate fiduciaries, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of CSC's business and financial affairs.  By virtue of such duties, the Individual Defendants were required, among other things, to:

- manage, conduct, supervise, and direct the business affairs of CSC in accordance with the laws of the State of Nevada, federal law, state and federal rules and regulations, and CSC's charter and bylaws;

- neither violate nor knowingly permit any officer, director, or employee of CSC to violate applicable federal laws, rules, and regulations and state law;

- establish  and maintain accurate books and records of the business and affairs of CSC and procedures for the reporting of the business and affairs to the board of directors, and to periodically investigate, or cause independent investigation to be made of, said books and records;

- maintain and implement adequate and functioning systems of financial controls, such that CSC's financial statements and other publicly disclosed information would be accurate;

7

- remain informed as to the status of CSC's operations, and upon receipt of notice or information of imprudent or unsound business practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with state and federal securities laws; and

- supervise the preparation and filing of any audits, reports, or other information required by law from CSC and to examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of CSC and to make full and accurate disclosures thereof.

## DUTIES OF THE AUDIT COMMITTEE MEMBERS

28.   CSC's Audit Committee Charter specifies that the Audit Committee is charged with responsibility for "oversee[ing] the accounting, financial reporting processes and related internal control framework of the Company and audits of the Company's financial statements and internal controls over financial reporting." In addition the Audit Committee is charged with assisting the Board in its oversight of the integrity of the Company's financial statements, and the performance of the Company's internal audit function and independent auditors.

29.   According to the Audit Committee Charter, the Audit Committee has specific responsibilities for:

- major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

- reviewing analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in

8

connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; the type and presentation of information to be included in earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), as well as review any financial information and earnings guidance provided to analysts and rating agencies;

- reviewing and discussing the Company's annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

- discussing the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies;

- discussing the Company's policies with respect to risk assessment and risk management;

- reviewing with the independent auditor any audit problems (including any significant disagreements with management) or difficulties (including any restrictions on the scope of the independent auditor's activities or on access to requested information), and management's response, including discussion of the responsibilities, budget and staffing of the Company's internal audit function;

- reviewing with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, or the performance of the internal audit function;

- preparing a report of the Committee as required by the Securities and Exchange Commission to be included in the Company's annual Proxy Statement;

9

- reviewing the Company's audited financial statements for each fiscal year and discussing them with management;

- recommending to the Board of Directors whether such audited financial statements be included in the Company's Annual Report on Form 10-K for such fiscal year for filing with the Securities and Exchange Commission; and

- reviewing and recommending to the Board any proposed changes to the Company's Code of Ethics and Standards of Conduct and the Company's Code of Ethics for the Principal Executive Officer, Principal Financial Officer and Principal Accounting Officer.

## SUBSTANTIVE ALLEGATIONS

30.    In a press release dated August 11, 2010, defendants caused CSC to reaffirm its guidance to shareholders for CSC's 2011 fiscal year as follows: "Bookings in excess of $18 billion, revenue in the range of $16.8 billion to $17.2 billion, operating margin between 9% and 9.25%, EPS in the $5.30 to $5.40 range, and Free Cash Flow in excess of 90% of net income attributable to CSC common shareholders."

31.    In that same press release, defendant Laphen stated: "I am pleased with our operational improvements and the corresponding financial results, particularly the margin and cash flow performance." He continued:

> I am encouraged by the size and quality of our current pipeline . . . . We are seeing increased demand emerging from some regions and within some industries. Our strategic targets of Cloud, Cyber and Healthcare, as well as network management are all indicating positive signs. Although our businesses are impacted by the overall sluggish recovery and, to a lesser extent government spending, we have a **very robust backlog** and I remain optimistic that we will realize meaningful growth beginning in the second half of our fiscal year. [emphasis supplied].

32.    On that same date, defendants caused CSC to report its first quarter 2011 financial results in its Form 10-Q filed with the SEC. Therein, defendants Laphen and Mancuso

certified CSC's financial statements and the internal controls, in accordance with §§ 302 and 906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley").

33. On November 10, 2010, defendants caused CSC to issue a press release reporting its second quarter 2011 financial results. Therein, the Company disclosed that it would make "adjustments" to its historical financial statements relating to accounting irregularities in its managed services sector, particularly in the Nordic region. CSC's margin growth would be lowered from between 9-9.25% to between 8.5-9% due to these problems. The release further stated that CSC had experienced a slowdown in customer decision-making affecting its public sector business, which would reduce 2011 revenue by at least $200 million.

34. Nonetheless, the press release stated that CSC's earnings outlook had actually increased from $5.30-$.540 per share to $5.35-$5.45 per share. The increase in projected earnings was reportedly primarily due to increased projected new bookings of $500 million, causing new bookings to rise from $18 to $18.5 billion.

35. During a conference call with investors on that same date, defendants Mancuso and Laphen assured investors that 98% of the Company's projected 2011 revenue was already in backlog. Furthermore, defendants represented that the accounting problems in the Nordic region had been "fixed." Indeed, defendant Mancuso assured shareholder as follows: "In reflecting on how you should think about the Nordics adjustment … [t]he good news is we found it, fixed it and put it behind us. So, again, to summarize how we feel, we are still bullish on the year. We feel good about our second-half revenue growth."

36. During the call, analysts inquired as to the effect of the accounting problems in the Nordic region, and of a reported renegotiation by the U.K.'s NHS of its multibillion-dollar contract with CSC. Defendant Mancuso responded:

> [Analyst] First question on the margin front, your new full-year margin guidance has, as you just said, Mike, the top end of 9% in terms of range for the year. But help us understand what it is without the Nordics adjustment for the full year.
>
> [Mancuso:] Off the top of my head, Darrin, the Nordics adjustment

11

is approximately $40 million, *net,* at this point. So if you were to add back $40 million of Q1 for the year, you'd have about a 0.25-point impact on the year, roughly.

\*      \*      \*

[Mancuso:] I'm not going to get into the revenue impact on the NHS. But I would tell you that the margin rate itself is not affected in terms of its rate. The revenue line will be smaller, to some degree, not much, but some. But the margin – there's not a change in the margin. It's just the contribution of the NHS in the year for margin will be less than it was and was anticipated in the prior guidance.

As far as the other impacts, the Nordics was $40 million plus, $50 millionish was the problem there. Other than that, margins are intact. We don't have any other issues, underperforming businesses, etc., etc.

37.   On November 10, 2010, defendants caused CSC to file with the SEC its Form 10-Q for the second quarter of 2011.  With respect to the accounting problems in the Nordic region, the Form 10-Q stated:

The Company's MSS segment incurred various adjustments, primarily in Europe's Nordic region, netting to approximately $30 million of charges in the second quarter and $40 million in the first six months of fiscal 2011 that should have been recorded in prior periods but were immaterial to previous and current year consolidated results. Charges resulted from accounting errors and the misapplication of internal accounting policies and U.S. GAAP, as well as from accounting irregularities in the Nordic region, principally affecting prepaid accounts and outsourcing contract costs.

Under the direction of the Company's Chief Executive Officer and Chief Financial Officer, the Company has evaluated its disclosure controls and procedures as of October 1, 2010. We have identified deficiencies that aggregate to a material weakness in our internal control over financial reporting. These deficiencies are related to a lack of appropriate tone at the top of the MSS Nordic business unit combined with inadequate monitoring controls over the financial position and results of operations of the underlying business, and a deterioration of the effectiveness of certain account reconciliations within MSS.

12

> These deficiencies were identified in a review of the Company's MSS business and reviews of the Company's monitoring controls. The review of the MSS Nordic business revealed accounting errors and irregularities resulting in adjustments that should have been recorded in prior years . . . . As a result of this material weakness in the operating effectiveness of our controls, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective as of October 1, 2010.

38. On February 1, 2011, CSC filed a Form 8-K with the SEC announcing that it had received notification that the SEC had launched a formal investigation into the accounting problems with its MSS line of business, particularly in the Nordic region:

> On January 28, 2011, Computer Sciences Corporation (the "Company") was notified by the United States Securities and Exchange Commission that the Commission has commenced a formal civil investigation relating to the Company's previously disclosed accounting adjustments in the Company's Managed Services Sector segment, primarily in Europe's Nordic region. The Company is cooperating with the Commission's investigation.

39. On February 9, 2011, defendants caused the Company to issue its third quarter results for fiscal year 2011. According to the press release, CSC's earnings per share of $1.54 were above expectations. Furthermore, CSC's 2011 bookings, projected to increase by $500 million just a few months prior, would instead be dramatically reduced by $2.5 billion. In addition, CSC's margins for the fiscal year would be reduced to as low as 8%, due to the accounting irregularities which occurred in the Nordic region. CSC's earnings guidance for the year was also reduced by up to $0.25 to $5.20 per share.

40. On February 9, 2011, the Company filed its third quarter Form 10-Q with the SEC. The Form 10-Q disclosed that in "the aggregate, the Nordic region charges totaled $23 million in the third quarter and $81 million for the first nine months of FY2011." Defendants further disclosed that "[t]he charges resulted from accounting irregularities in the Nordic region and to a lesser extent, from accounting errors and misapplication of U.S. GAAP in the Nordic

region and other parts of MSS. These errors affected principally revenue, prepaid accounts, outsourcing contract costs, and other long-term liabilities."

41.   Defendants further admitted:

As previously reported in the second quarter, we identified deficiencies that aggregated to a material weakness in our internal control over financial reporting. These deficiencies are related to a lack of appropriate tone at the top of the MSS Nordic business united combined with inadequate MSS segment monitoring controls over the financial position and results of operations, and a deterioration of the effectiveness of certain account reconciliations.

As a result of this material weakness in the operating effectiveness of our controls, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2010.

42.   The February 9, 2011 Form 10-Q also disclosed that the Company had been having problems with implementation of its multi-billion dollar contract with the NHS. The Form 10-Q disclosed for the first time that, not only had the NHS notified CSC that it might be in breach of its contract for failing to meet contract deadlines, but that the NHS was considering terminating all or part of its contract with CSC:

The Company's contract with the U.K.'s National Health Service ("NHS") to deliver an integrated electronic patient records system with an announced value of approximately $5.4 billion is a large and complex contract and is included in the BSS segment. . . .

Implementation of the software release known as Lorenzo Release 1.9 at the fourth early adopter, Pennine Care NHS Foundation Trust, has been delayed and is now expected to occur in the first quarter of fiscal year 2012. On February 4, 2011, the NHS formally notified the Company that it believes the Company's failure to achieve a key milestone related to the Pennine implementation by January 28, 2011, constitutes a breach of contract and the NHS is considering its position on **termination of all or parts of the contract**.... Both the NHS and the Company have indicated their intent to continue discussions regarding modifications to the contract with the agreed mutual intent to reach agreement as soon as practicable on terms satisfactory to both

14

parties. These modifications, if agreed could result in a further reduction to total contract value in addition to the reduction described above. The contract is currently profitable and the Company expects to recover its investment. Future events, including the results of the contract negotiations between the parties, could result in a charge to reduce the contract profitability recognized to date, reduced future profitability and have an adverse impact on the Company's cash flows. [emphasis supplied].

43.     On February 9, 2011, CSC held a conference call for investors during which defendants disclosed that the accounting problems in the Nordic region, along with delays in government contracts which had "slipped" into later time periods, had resulted in reduced profitability. Defendants disclosed that the NHS was claiming that CSC had breached its contract for failure to meet contract milestones.

44.     During the call, defendant Laphen stated:

Third quarter profitability was primarily impacted by some trailing effects from the previously disclosed Nordics issue....The operating income recovery in the fourth quarter combined with the improved tax rate brings our full-year EPS guidance to $5.20. Topline revenue guidance for the full year is impacted by a couple of factors. NPS delays in new awards as well as the impact of temporary funding shortages on existing contracts, and there is a shift of an NHS milestone from the fourth quarter in early next fiscal year.

\*       \*       \*

Our new business bookings for Q3 were softer than we had expected, coming in at $2.3 billion.

\*       \*       \*

Since our last call, clients slipped award dates for some $6.6 billion of opportunities out of our fiscal year 2011 into fiscal year 2012. Of this total, $3.9 billion are in NPS, and $2.7 billion are in the MSS pipeline.

These opportunities are delayed, not lost, and they remain in our competitive pipeline. The volume of these delays requires however that we amend our bookings guidance for the fiscal year 2011 to $16 billion in TCV.

15

\*       \*       \*

On February 4, NHS notified us that it believes our delay in achieving a milestone related to the Pennine Trust implementation constitutes a breach of contract.

\*       \*       \*

The financial impact of shifting the NHS milestone into the next fiscal year is included in our fiscal year guidance.

45.    During the same call, defendant Mancuso stated:

[I]n NPS, we continued to experience delays by the federal government in awarding contracts despite previously announced decision dates....

Again this quarter our margins were negatively impacted by additional charges stemming from our Nordics business, the result of our continuing cleanup actions.

\*       \*       \*

[O]ur full-year guidance [figures] ... which are lower than our prior guidance reflect the slowdown in orders and revenue resulting from the award delays and the NHS milestone we talked about earlier.

Operating income margin has been reduced primarily because of lower revenue, mix and the Nordics and lower EPS is a fallout of both.

46.    With respect to the accounting irregularities in the Company's Nordic region, which defendants had previously stated were contained, analysts questioned whether more irregularities would be revealed through the recently announced SEC investigation:

[Analyst:] [O]n the Nordics region issues ... I think last quarter you said something similar. How can we feel confident that this is not going to reoccur ... ?

\*       \*       \*

[Mancuso:] As far as the Nordics is concerned, one way to think

16

about this thing, we've taken the Nordics organization, its financial
statements, and turned it literally upside down.

\*     \*     \*

We're highly confident that we have most of the issues identified.
but that's not to say that something won't pop, which it did this
quarter that we didn't anticipate.

\*     \*     \*

[Analyst:] Mike, on NHS, ... [i]s the only impact from the deferral
of the milestone from Pennine, is that only on a free cash flow
impact or did that also impact revenue and EPS in the fourth
quarter?

[Mancuso:] That impacted revenue and EPS. ... I won't give you a
profitability number because I'm not able to give that. But the
revenue impact was about $175 million in the fourth quarter.

[Analyst:] So going back to the Nordics, I might've missed it, but
can you provide some detail on what makes up the earnings hit in
terms of the components? How much [is audit] costs, how much
may be a reversal of prior recognized revenue and profits?

\*     \*     \*

[Mancuso:] As far as the details of Nordics, I don't want to get into
a line by line item in terms of quantification.

It was a potpourri of issues like capitalizing expense items and
deferring the recognition in the P&L, hanging them up on the
balance sheet, credit agreements, customer credit agreements that
were not book kept, therefore the books didn't reflect the
obligation.

It was any combination of those kinds of things, a smattering of
small items, a few $5 million and $10 million items, but pervasive
in the sense that it added up to a large number.

47.    Despite the disclosures regarding further booking delays and accounting

problems, defendants nevertheless assured investors that the Company was not losing market

17

share on government contracts, its new, reduced 2011 bookings forecast of $16 billion was the "right number," and it had already factored in the impact of government delays to this figure. Defendants also said that the new bookings forecast assumed the government budget delays related to upcoming appropriations bills would not get resolved until after the Company's fiscal year, thus signaling that these forecasted new bookings were firm:

> [Laphen:] With regard to new business, chart eight lays out our year-over-year new bookings results by quarter.
>
> \*      \*      \*
>
> We anticipate Q4 to exceed last year based on contract negotiations underway and a sizable number of proposals in evaluation. We think on balance, $16 billion is about the right number for the year given the federal government delays discussed earlier.
>
> \*      \*      \*
>
> [Analyst:] I wonder if we could talk a little bit more about the government delays. I know you commented on this earlier, but maybe you could give us just a little bit more color on why you expect these to be delays and why it's not lost or maybe reduced business.
>
> [Laphen:] Well the - in terms of the new business that was shifted out, those opportunities are still there. They have not been canceled by the government. And we are not aware of any plans to cancel them.
>
> \*      \*      \*
>
> [Analyst:] Thanks for squeezing me in. guys. Just two quick ones, if I could. First on the continuing resolution, obviously that's nothing new and it's been going on for a while and I think early March is the current expiration date on that. What are you guys assuming from a planning perspective?
>
> Are you assuming that all the appropriations bills get done by March 2 or 3 whatever the deadline is there? Or are you assuming that perhaps the CR will extend perhaps as long as the full government fiscal year? What is your sense?

18

[Laphen:] We are assuming for our fourth-quarter picture that it does not get resolved during this fiscal year.

48.     Just a few months later, on May 2, 2011, CSC issued a press release disclosing fourth quarter 2011 financial information, and dramatically lowering the February 2011 bookings, revenue, margin and earnings per share guidance for fiscal year 2011. Bookings guidance was reduced by another $2 billion, and projected earnings per share were sharply reduced to $4.75 from $5.20. On May 25, 2011, the Company preannounced even lower earnings per share for fiscal year 2011 of $4.73, "primarily due to a profit adjustment related to the Company's contract with National Health Service in the United Kingdom, net out of period adjustments in the Company's Managed Services Sector and a higher effective tax rate."

49.     On May 25, 2011, CSC also held an earnings call for the fourth quarter of 2011. Preliminary financial results had been issued earlier that day. During the earnings call CSC announced that on May 2, 2011, the Audit Committee of the Board of Directors had commenced its own independent investigation into the same issues that the SEC began investigating in January. According to defendants, that investigation was not yet sufficiently complete, and as a result, the Company would not meet its filing deadline of May 31, 2011 for its financial statements for the year ended April 1, 2011. Defendants advised that CSC expected to file its Form 10-K on or before June 15, 2011.

50.     The June 15, 2001 Form 10-K admitted to significant errors in the Company's financial reporting going back to 2009, including misapplication of U.S. Generally Accepted Account Principles ("GAAP"), inappropriate capitalization of operating costs, and further "miscellaneous errors." This would require $91 million in "adjustments" to previously reported financial statements. According to the Form 10-K, "based upon the Company's review of the underlying documentation for certain transactions and balances, review of contract documentation and discussions with Nordic personnel, the Company has attributed the majority

19

of the $91 million of adjustments to accounting irregularities arising from suspected intentional misconduct by certain former employees in our Danish subsidiaries."

51. The Form 10-K continued:

> As previously disclosed, in fiscal year 2011, the Company initiated an investigation into certain accounting errors in our MSS segment, primarily involving accounting irregularities in the Nordic region. Initially, the investigation was conducted by Company personnel, but outside Company counsel and forensic accountants retained by such counsel later assisted in the Company's investigation.
>
> On January 28, 2011, the Company was notified by the Division of Enforcement of the SEC that it had commenced a formal civil investigation relating to these matters and other matters subsequently identified by the SEC, with which the Company is cooperating. On May 2, 2011, the Audit Committee of the Board of Directors commenced an independent investigation into matters relating to MSS and the Nordic region matters identified by subpoenas issued by the SEC's Division of Enforcement and certain other accounting matters identified by the Audit Committee and retained independent counsel to represent CSC on behalf of, and under the exclusive direction of, the Audit Committee in connection with such independent investigation. Independent counsel has retained forensic accountants to assist their work. Independent counsel also represent CSC on behalf of, and under the exclusive direction of, the Audit Committee in connection with the investigation by the SEC's Division of Enforcement.
>
> In addition, the SEC's Division of Corporation Finance has issued comment letters to the Company requesting additional information regarding its previously disclosed adjustments in connection with the above-referenced accounting errors, the Company's conclusions regarding the materiality of such adjustments and the Company's analysis of the effectiveness of its disclosure controls and procedures and its internal control over financial reporting. The Division of Corporation Finance's comment letter process is ongoing, and the Company is continuing to cooperate with that process.

52. The Form 10-K stated that the SEC investigation and related matters would damage the Company:

20

The investigations being conducted by the Division of
Enforcement and the Audit Committee as well as the review of our
financial disclosures by the Division of Corporation Finance are
continuing and could identify other accounting errors. As a result,
we have incurred and will continue to incur significant legal and
accounting expenditures, and a significant amount of time of our
senior management has been focused on these matters. We are
unable to predict how long the Division of Enforcement's and
Audit Committee's investigations will continue or whether, at the
conclusion of its investigation, the SEC will seek to impose fines
or take other actions against us. In addition, we are unable to
predict the timing of the completion of the Division of Corporation
Finance's review of our financial disclosures or the outcome of
such review. Publicity surrounding the foregoing or any
enforcement action as a result of the SEC's investigation, even if
ultimately resolved favorably for us, could have an adverse impact
on our reputation, business, financial condition or results of
operations.

53.     The Form 10-K provided the following description of the restated items:

During fiscal 2011, the Company recorded various pre-tax
adjustments reducing income from continuing operations before
taxes by $51 million ($34 million, net of taxes), that should have
been recorded in prior fiscal years. As discussed below, these
recorded adjustments comprised $91 million of charges reducing
income from continuing operations before taxes originating out of
the Company's MSS operations in the Nordic region, and $40
million of adjustments increasing income from continuing
operations before taxes, principally out of other MSS businesses
with $36 million of the $40 million within MSS. These
adjustments reduced MSS operating income (a non-GAAP
measure) by $53 million as discussed in Note 15, Segment and
Geographic Information. The Company also recorded out of
period income tax benefits in fiscal 2011 of $17 million, consisting
of $12 million of income tax benefits related to the net out of
period adjustments and $5 million of unrelated income tax benefit
adjustments.

54.     Significantly, the Form 10-K revealed that the very internal control problems

leading to the required "adjustments" had existed "as of" April 2010:

In connection with the preparation and filing of its Quarterly
Reports on Form 10-Q for the periods ended October 1, 2010 and

December 31, 2010, the Company concluded that a material weakness existed as of October 1, 2010 and December 31, 2010 due to the aggregation of a significant deficiency in the Nordic business (**initially identified as of April 2, 2010, which continued to exist through the third quarter of fiscal 2011**) and a deficiency in account reconciliation procedures and controls identified at other MSS business units during fiscal 2011. The Company concluded as of the end of October 1, 2010 and December 31, 2010 that individually these deficiencies were not material weaknesses. However, when they were considered in the aggregate, the Company concluded that there was a reasonable possibility that the Company's internal control over financial reporting could fail to prevent or detect a material misstatement of the Company's financial statements, and therefore that a material weakness existed as of each of these dates. The material change in internal control over financial reporting during the fourth quarter relates to the remediation of the material weakness.

**As a result of the significant deficiency in the Nordic business, the Company did not detect as of April 2, 2010, the out of period adjustments included in Note 2 of the Consolidated Financial Statements.** The Company identified and corrected these out-of-period errors in fiscal 2011, and has attributed the majority of the errors in the Nordic business to accounting irregularities. The significant deficiency in the Nordic business as of April 2, 2010 resulted from a combination of deficiencies primarily in the following areas:

-**Nordic business "Tone at the Top"**

-**Oversight and monitoring controls**

-**Account reconciliations**

[emphasis supplied].

55.    The "deficiencies" identified by the 2011 Form 10-K were in the direct purview of the Audit Committee defendants. Demonstrating the lack of internal controls which had existed in the MSS segment, the Company announced remedial measures, including appointment of a president of MSS EMEA (Europe, Middle East, Africa) **"to fill a position that had been vacant for over a year."** [emphasis supplied]. The Company also announced "more rigorous procedures and controls in the financial closing and reporting process (FCRP) over the following

22

areas: review and approval of journal entries, account reconciliations (addressed more fully in the following section) and analysis of operating results, balance sheet and cash flow variances."

56.    According to the Company: "**substantial remediation of existing reconciliation procedures was necessary with respect to timeliness, completeness, form and content (generally requiring a reconciliation of the components of the balance, rather than a summary of transaction activity), timely investigation of significant reconciling items and adequate documentation.**" [emphasis supplied].

57.    According to the Company: "as of the end of the second quarter, the Company concluded the account reconciliation procedures **in other locations** had deteriorated **since the end of fiscal 2010 and a deficiency existed in other MSS locations outside of the Nordic region.** The Company implemented remediation activities consistent with the Nordic region with respect to timeliness, completeness, form and content (generally requiring a reconciliation of the components of the balance, rather than a summary of transaction activity), timely investigation of significant reconciling items and adequate documentation." [emphasis supplied].

58.    The disclosures in the fiscal year 2011 Form 10-K confirmed that the Company's fiscal year 2010 financial results, as reported in (a) quarterly SEC filings dated August 7, 2009; November 12, 2009; and February 2, 2010, certified by defendants Laphen and Mancuso, and (b) the 2011 Form 10-K filed on May 21, 2010, signed by defendants Laphen, Mancuso, Baum, Barram, Chase and Patrick, were false. The fiscal year 2011 Form 10-K revealed that defendants' Sarbanes-Oxley certifications in each of these filings attesting to the adequacy of the Company's internal controls were also false.

59.    As the grossly inflated financial projections, accounting fraud and internal control problems were gradually exposed, CSC's share price plummeted from over $56 per share in January 2011 to approximately $30 as of the date of this complaint, causing a massive reduction in shareholder value.

23

## THE COMPANY HAS BEEN DAMAGED

60.     The false financial guidance and accounting scandal at CSC has damaged the Company. According to the Company's SEC filings, the Company is exposed to "substantial" investigation expenses related to the accounting irregularities at the Company and the ensuing Board and SEC inquiries being conducted by the SEC's enforcement and corporate finance divisions. The Company has admitted in SEC filings that these costs, as well as the substantial management time devoted to address these issues, would adversely affect the Company's financial condition, and harm the Company's reputation.

61.     The Company has also been exposed to substantial defense costs and expense (and potential liability) arising out of securities fraud class-action litigation filed in federal court in Virginia by purchasers of the Company's securities during the financial reporting periods for which the Company's projections and results were false, in an action captioned In re Computer Sciences Corporation Securities Litigation, No. 11-CV-00610 TSE-IDD (E.D. Va.). The initial complaints in that action allege that CSC and defendants Laphen and Mancuso acted with scienter, or intent to defraud investors, by issuing inflated financial projections and false financial results for fiscal years 2010 and 2011.

62.     In addition, the restatement has caused substantial damage to the Company's reputation in the financial markets. This is evidenced in part by the decline in the Company's share price following revelations that the Company's financial projections were bogus, its financial statements contained errors, and the Company's internal controls were deficient.

## DERIVATIVE ACTION ALLEGATIONS

63.     Plaintiff brings this action on behalf of CSC to enforce the Company's claims against the Individual Defendants, which claims may properly be asserted by CSC and which CSC has failed to enforce.

64.     The wrongs complained of herein occurred while plaintiff was a CSC shareholder. Plaintiff has been a shareholder since 1998 and continues to hold CSC shares.

24

Hence, plaintiff has standing to bring this derivative action on behalf of the Company to recover damages for all of the conduct described in the complaint.

65.     Plaintiff will fairly and adequately protect the interests of CSC and its shareholders in enforcing the rights of CSC against the Individual Defendants. Plaintiff's attorneys are experienced in this type of litigation and will prosecute this action diligently on behalf of CSC to ensure the rights of CSC. Plaintiff has no interests adverse to CSC.

## DEMAND IS EXCUSED FOR FUTILITY

66.     Demand on CSC's Board of Directors to bring this action has not been made and is not necessary because such demand would be futile.

67.     At the time of the filing of this complaint, CSC's Board of Directors consisted of ten members, six of whom (a majority) are named as defendants in this action. The Audit Committee members alone constitute one-half of the board.

68.     A shareholder demand on each Audit Committee member is futile for the following reasons:

a.     Pursuant to their specific duties as Board members, the Audit Committee directors are responsible for managing the Company's affairs regarding internal audit and disclosure. Defendants breached the fiduciary duty of loyalty (and candor and good faith) owed to CSC and its shareholders in that they caused false and misleading statements about CSC's revenues, income, and earnings to be made to CSC's shareholders. As confirmed by CSC's Audit Committee charter, the Audit Committee defendants reviewed CSC's financial guidance, as included in, at least, the Company's August 11, 2010, November 10, 2010 and February 9, 2011 press releases. As confirmed by CSC's Audit Committee Charter, the Audit Committee defendants also reviewed CSC's financial statements and SEC filings. CSC's financial guidance and financial statements were false, as alleged herein. For example, defendants Barram, Baum, Chase and Patrick signed the fiscal year 2010 Form 10-K that CSC filed with the SEC, which contained false 2010 financial results, and false statements concerning the supposed adequacy of the Company's internal control environment - which was

25

in truth materially degraded at the time of said Form 10-K, as revealed by defendants'
admission that internal control breakdowns had existed as of April 2010, before the 2010 Form
10-K was filed in May 2010.  Likewise, the Audit Committee defendants knew that the
Company's financial guidance during 2010 and 2011 was unsubstantiated, in light of internally
known adverse developments involving CSC's massive contract with the NHS, contract delays,
and the adverse effect on earnings of the Company's internal accounting investigation and
multiple SEC inquiries. As such, they are interested in the outcome of any inquiry or litigation
concerning CSC's false guidance and false financial statements, and face a substantial
likelihood of liability based on their participation in the approval, review and dissemination of
CSC's false financial guidance and false statements concerning the Company's internal
controls to the shareholders.

b.       Demand is excused because the Audit Committee defendants failed to timely
detect, prevent and halt pervasive accounting problems occurring at CSC, including the
issuance of false guidance and financial statements to shareholders, in the face of internal
control breakdowns that admittedly existed at the Company as early as April 2010, more than a
year before the required "adjustments" were reported. This delay, during which the internal
controls worsened, as confirmed by CSC's SEC filings, evidences defendants' willful conduct.

c.       Demand is further excused because the conduct alleged herein, including the
issuance of false financial guidance, and permitting the Company to operate with woefully
inadequate internal controls over at least two fiscal years, was not the product of a valid exercise
of business judgment. The SEC filings identified herein, including a Form 10-K signed by each
of the Audit Committee directors then serving, falsely represented that the Company maintained
an effective internal control environment, and that the Company's financial statements were
complete, accurate and free of misstatement. The Audit Committee defendants likewise knew
that the Company's financial guidance was unsubstantiated, in light of adverse developments
involving one of CSC's massive contracts with the NHS and the adverse effect of the internal
accounting investigation and SEC inquiries. The conduct alleged herein, including but not

26

limited to the issuance of such statements to shareholders, was so egregious on its face that board approval cannot possibly meet the test of business judgment, and a substantial likelihood of director liability for breach of fiduciary duty therefore exists.

      d.     The Audit Committee directors receive material payments, benefits, stock options and other emoluments by virtue of their board membership, including hundreds of thousands of dollars a year in cash and stock awards, as alleged herein. The Audit Committee directors received these large payments during fiscal years (2010 and 2011) in which they breached their fiduciary duties, as alleged herein, and they continue to receive them. The amounts paid to each defendant are material, and they are material to each defendant. Defendants will act to preserve, and not threaten, their positions of control and the perquisites thereof; and are therefore incapable of exercising independent objective judgment in deciding whether to bring this action.

      e.     The Audit Committee defendants served during some or all of the periods that the Company's internal controls were failing, and false financial statements were disseminated to CSC's shareholders. The Audit Committee is responsible for reviewing the integrity of CSC's auditing, accounting, and reporting processes; reviewing CSC's financial reports and other financial information provided to the public and filed with the SEC; and reviewing CSC's internal controls regarding finance and accounting. The Audit Committee directors breached their fiduciary duties by causing or allowing the improper financial information and statements regarding CSC's internal controls to be included in the Company's Form 10-K and 10-Q reports, and by failing to timely act when put on notice that the Company's internal controls were failing. These directors had special duties to ensure that appropriate measures were taken to fix the Company's internal control environment, which they utterly failed to do. As a result of these defendants' breach of their duties, any demand upon them would be futile.

      f.     As alleged herein, the current Audit Committee directors were responsible for overseeing the internal control environment at the Company, and had specific duties relating to the Company's financial disclosure controls and audit function. However, in their report on the "adjustments" contained in the June 15, 2011 Form 10-K, the Audit Committee directors failed

to hold themselves or any other serving directors accountable for CSC's damaging accounting scandal, and instead sought to blame personnel in Denmark. The investigation absolving the Audit Committee directors was performed by members of the Audit Committee themselves even where the Company's internal control breakdowns called their own actions (and inactions) into serious question. Having already blamed others, any demand on these same directors now to investigate and sue themselves, or other directors or management of CSC, for breach of fiduciary duty would be a futile act under the circumstances, and demand is therefore excused.

69.     A shareholder demand on defendant Laphen is futile for the following reasons:

a.     Defendant Laphen is employed full-time by the Company, and has received and continues to receive substantial monetary compensation as a result of that employment, including at least $27.5 million in the last two fiscal years alone. These amounts are material, and they are material to defendant Laphen. Defendant Laphen will act to preserve and not threaten his position of control and the perquisites thereof, and is therefore incapable of exercising independent objective judgment in deciding whether to bring this action.

b.     Defendant Laphen is a defendant in the federal securities class action, as alleged herein. In light of the pending federal securities class actions, in which many of defendant Laphen's statements and disclosures are alleged to be fraudulent, it is not possible for defendant Laphen to consider a shareholder demand impartially.

c.     Defendant Laphen lacks independence. Indeed, CSC admits in SEC filings that Laphen is not an independent director.

70.     In light of the pending federal securities class actions, it is not possible for the any of director defendants in this case to consider a shareholder demand impartially. If the Company pressed forward with its claims against the defendants in this case, then the Company's efforts could undercut or even compromise the defense of the securities class action.

71.     Demand is further excused because, although CSC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, the Board of

28

Directors has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for CSC any part of its admitted damages.

## FIRST COUNT

## BREACH OF FIDUCIARY DUTY AGAINST ALL INDIVIDUAL DEFENDANTS

72.    Plaintiff incorporates paragraphs 1-71.

73.    Each of the Individual Defendants was a director and/or officer of CSC during the relevant period, and as such owed to CSC fiduciary obligations. In violation of these fiduciary duties, the Individual Defendants failed to disclose, or caused the Company to fail to disclose, material information and/or made material misstatements to CSC's shareholders regarding the Company's business, financial condition and accounting procedures.

74.    These Individual Defendants knew or recklessly disregarded that the statements about CSC's business, its financial condition, and accounting procedures were false when made. The preparation and dissemination of inaccurate press releases and SEC filings alleged herein represents a failure by the Individual Defendants to ensure the existence within CSC of appropriate and adequate internal financial controls and a reasonable information and reporting system necessary to ensure the accuracy of the Company's financial reporting.

75.    By reason of this conduct, the Individual Defendants have exposed CSC to massive investigation costs, and potential liability and regulatory penalties, and to the cost of defending the SEC inquiries and securities litigation. In addition, the Company's reputation and goodwill in the securities markets has been severely damaged, thereby hampering the Company's ability to secure future business partners and financing.

76.    Consequently, as a direct and proximate result, CSC has been and is being further damaged by the Individual Defendants' conduct in breach of their fiduciary duties. Plaintiff incorporates by reference the allegations set forth above.

29

## SECOND COUNT

## CONTRIBUTION AND INDEMNIFICATION AGAINST ALL INDIVIDUAL DEFENDANTS

77.     Plaintiff incorporates paragraphs 1-71.

78.     CSC is alleged to be liable to public and private persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to defendants' liability to CSC.

79.     CSC's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or or bad faith acts or omissions of defendants.

80.     CSC is entitled to contribution and indemnification from each of the defendants in connection with all such claims that have been, are or may in the future be asserted against CSC by virtue of defendants' wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of CSC, demands judgment against the Individual Defendants as follows:

A.      Determining that this suit is a proper derivative action and certifying plaintiff as an appropriate representative of CSC for said action.

B.      Declaring that each of the Individual Defendants breached their fiduciary duties to CSC.

C.      Determining and awarding CSC the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest thereon.

D.      Determining and awarding CSC restitution from the Individual Defendants, and each of them, including ordering disgorgement of all profits, benefits, and other compensation obtained by said Individual Defendants.

E.   Directing CSC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CSC and its shareholders from a repeat of the damaging events described herein.

F.   Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses.

G.   Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action so triable.

Respectfully submitted,
Che Wu Hung, by:

Robert Wilson (VSB# 77791)
Eugene Benick (VSB# 76495)
FINKELSTEIN THOMPSON LLP
1050 30th Street NW
Washington, DC 20007
Tel:   202-337-8000
Fax:   202-337-8090

*Counsel for Plaintiff*

Robert C. Schubert
Willem F. Jonckheer
Miranda P. Kolbe
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94114
Tel:   415-788-4220
Fax:   415-788-0161

E.   Directing CSC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CSC and its shareholders from a repeat of the damaging events described herein.

F.   Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses.

G.   Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action so triable.

Respectfully submitted,
Che Wu Hung, by:

Robert Wilson (VSB# 77791)
Eugene Benick (VSB# 76495)
FINKELSTEIN THOMPSON LLP
1050 30th Street NW
Washington, DC 20007
Tel:   202-337-8000
Fax:   202-337-8090

*Counsel for Plaintiff*

Robert C. Schubert
Willem F. Jonckheer
Miranda P. Kolbe
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94114
Tel:   415-788-4220
Fax:   415-788-0161

*Of Counsel*

31

**FILED**

**FAIRFAX COUNTY CIRCUIT COURT**

2011 SEP 30 PM 1:53

Che Wu, Hung vs. Michael W Laphen, etal.

CLERK CL2011-0013376

FAIRFAX, VA

2400651D

TO:     Computer Sciences Corp
         Nominal Defendant
         Serve: CT Corp System
         4701 Cox Rd Suite 301
         Glen Allen VA 23060

**Complaint**

## HENRICO COUNTY SHERIFFS USE ONLY:

☐    **Personal Service**

       **Being unable to make personal service, a copy was delivered in the following manner:**

☐    **Delivered to person found in charge of usual place of business or employment during business hours and giving information of its purport.** _____

☐    **Delivered to family member (not temporary sojourner or guest) age 16 or older at usual place of abode of party named above after giving information of its purport. List name, age of recipient, and relation of recipient to party named above.**

       _____

☐    **Posted on front door or such other door as appears to be the main entrance of usual place of abode, address listed above. (Other authorized recipient not found)**

☐    **Served on Secretary of the Commonwealth**

☐    **Served on the Clerk of the State Corporation Commission pursuant to Virginia Code §8.01-513**

☐    **Served on registered agent of the corporation. List name and title:**

       _____

☐    **Served on the Commissioner of the Department of Motor Vehicles**

☐    **Not found**

             _____, **Sheriff**

_____    by _____

**Date**                    **Serving Deputy Sheriff**

                   **City or County of Locality**

Service Authorization

CT Corporation System is registered agent for various corporations, limited liability companies and partnerships. The following persons are designated in the office of the corporation upon whom any process, notice or demand may be served as representatives of the Corporation.

Tinika C. Baylor

Katie E. Bush

Adam Carr

Jenn Greene

Dacia Jamison

This authorization pertains to the authority of individuals to receive process on behalf of CT Corporation System and Business Filings Incorporated. It does not certify the receipt or acceptance of any specific process.

Tinika C. Baylor
Corporate Operations Manager
CT Corporation System
A Wolters Kluwer Company

State of Virginia
County of Henrico

This day personally appeared before me, Tinika C. Baylor, whose name is signed above and who, being first duly sworn, upon her oath, states that the foregoing Affidavit is true to the best of her knowledge and belief.

Subscribed and sworn before me this _10th_ day of _March_, 2010

Notary Public


**FINKELSTEIN THOMPSON** LLP

FILED
COMPUTER SECTION

2011 OCT -5 PM 12: 10

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

Please respond to Washington, D.C. office

Writer's direct email: rwilson@finkelsteinthompson.com

October 3, 2011

Fairfax County Circuit Court
Clerk's Office
4110 Chain Bridge Road
Fairfax, Virginia 22030

RE:  *Che Wu Hung v. Michael W. Laphen, et al.*, No. CL-2011-13376

Dear Clerk:

Please find enclosed a notice of change of address for filing in the above-styled case. Please file the notice, date stamp the enclosed copy, and return it via the enclosed self-addressed stamped envelope. Thank you for your attention to this matter. If you have any questions, please feel free to contact me.

Sincerely,

Robert Wilson
*Counsel for Plaintiff*

[Enclosures]

1077 30TH STREET, NW • SUITE 150 • WASHINGTON, DC 20007 • TEL: 202.337.8000 • FAX: 202.337.8090 • TOLL FREE: 877.337.1050

100 BUSH STREET • SUITE 1450 • SAN FRANCISCO, CA 94104 • TEL: 415.398.8700 • FAX: 415.398.8704 • TOLL FREE: 877.800.1450

WWW.FINKELSTEINTHOMPSON.COM

**VIRGINIA:**

### IN THE CIRCUIT COURT OF FAIRFAX COUNTY

FILED
COMPUTER SECTION

2011 OCT -5 PM 12: 11

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

| | |
|---|---|
| CHE WU HUNG, *derivatively on behalf of Computer Sciences Corp.*, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    CL-2011-13376 |
| | ) |
| MICHAEL W. LAPHEN, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| COMPUTER SCIENCES CORP., | ) |
| | ) |
| Nominal Defendant. | ) |

### NOTICE OF CHANGE OF ADDRESS

Please note that the law firm of Finkelstein Thompson LLP, counsel for Plaintiff, has

changed its address. Please direct all future correspondence to the new address listed below.

Respectfully submitted,
Che Wu Hung, by:

Robert O. Wilson (VSB# 77791)
Eugene J. Benick (VSB# 76495)
FINKELSTEIN THOMPSON LLP
James Place
1077 30th Street NW, Suite 150
Washington, DC 20007
Tel:    202-337-8000
Fax:    202-337-8090
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 3, 2011, I served a true copy of the foregoing by first class mail

pursuant to Virginia Supreme Court Rule 1:12 on Computer Sciences Corporation, the only

defendant served with process thus far, through its registered agent at 4701 Cox Road, Suite 301,

Glen Allen, Virginia 23060, with a courtesy copy to its general counsel at 3170 Fairview Park

Drive, Falls Church, Virginia 22042.

_Robert O Wilson_

VIRGINIA:

IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

FILED
MOTIONS DOCKET
2011 OCT -7  PM 4: 03

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

CHE WU HUNG, derivatively, on behalf of )
COMPUTER SCIENCES CORPORATION, )
                Plaintiff, )
 )
          v. ) CL 2011-13376
 )
MICHAEL W. LAPHEN, MICHAEL J. )
MANCUSO, DAVID J. BARRAM, STEPHEN )
L. BAUM, ERIK BRYNJOLFSSON, )
RODNEY F. CHASE AND THOMAS H. )
PATRICK, )
 )
             Defendants, )
 )
   - and - )
 )
COMPUTER SCIENCES CORPORATION, )
          Nominal Defendant. )

## UNOPPOSED MOTION FOR EXTENSION OF TIME FOR COMPUTER SCIENCES CORPORATION TO FILE ITS MOTION, ANSWER OR OTHER RESPONSIVE PLEADING

Defendant Computer Sciences Corporation ("CSC"), by and through its undersigned counsel, hereby moves this Honorable Court to extend the deadline for CSC's filing of its motion, answer or other responsive pleading to the Complaint from October 17, 2011 until December 1, 2011. Plaintiff Che Wu Hung, suing derivatively and on behalf of CSC, does not oppose the motion. Upon information and belief, Defendants Michael W. Laphen, Michael J. Mancuso, David J. Barram, Stephen L. Baum, Erik Brynjolfsson, Rodney F. Chase and Thomas H. Patrick have not been served copies of the Complaint or accompanying summons. In support of the motion, CSC states the following:

1.      Plaintiff filed the above-captioned case in the Circuit Court of Fairfax County on September 13, 2011.

2.    Plaintiff served summonses and copies of the Complaint on CSC's statutory agent on September 26, 2011.

3.    Plaintiff has not served summonses and copies of the Complaint on Defendants Michael W. Laphen, Michael J. Mancuso, David J. Barram, Stephen L. Baum, Erik Brynjolfsson, Rodney F. Chase and Thomas H. Patrick.

4.    Plaintiff will not be prejudiced by the extension of time because other Defendants have not yet been served summonses and copies of the Complaint.

5.    A modest extension of 45 days does not impede the Court's administration of justice because other Defendants have not yet been served summonses and copies of the Complaint.

WHEREFORE, in consideration of the foregoing, Defendant CSC respectfully requests this Court to extend the time for Defendant CSC to take any action with respect to the Complaint filed in the above-captioned case, including moving, answering or otherwise responding, until December 1, 2011.

Dated:  October 7, 2011                          Respectfully submitted,

David E. Carney (Va. Bar No. 43914)
*Counsel for Nominal Defendant Computer*
*Sciences Corporation*
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC  20005
Telephone:  (202) 371-7000
Facsimile:  (202) 393-5760
David.Carney@skadden.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2011, I served a copy of the foregoing Unopposed Motion For Extension Of Time For Computer Sciences Corporation To File Its Motion, Answer Or Other Responsive Pleading by facsimile on the following:

Robert Wilson
Eugene Benick
FINKELSTEIN THOMPSON LLP
Suite 150
1077 30th Street NW
Washington, DC 20007
Fax: 202.337.8090

Robert C. Schubert
William F. Jonckheer
Miranda P. Kolbe
SCHUBERT JONCKHEER & KOLBE LLP
Suite 1650
Three Embarcadero Center
San Francisco, CA 94114
Fax: 415.788.0161

David E. Carney

**VIRGINIA:**    **IN THE CIRCUIT COURT OF FAIRFAX COUNTY**

FILED
MOTIONS DOCKET

CHE WU HUNG, derivatively, on behalf of COMPUTER SCIENCES, etc.
            **Plaintiff**

2011 OCT -7 PM 4:03

vs.      Civil Action No.   CL 2011-13376

JOHN T. FREY
CLERK, CIRCUIT COURT   Previous Chancery No.   CH
FAIRFAX, VA

Michael W. Laphen et al.
            **Defendant**

**SERVE:**   Robert Wilson and Eugene Benick; FINKELSTEIN THOMPSON LLP; Suite 150; 1077 30th Street NW; Washington, DC 20007
         Robert C. Schubert, William F. Jonckheer and Miranda P. Kolbe; SCHUBERT JONCKHEER & KOLBE LLP; Suite 1650; Three Embarcadero Center; San Francisco, CA 94114

### FRIDAY MOTIONS DAY – PRAECIPE/NOTICE

**Moving Party:** ☐ Plaintiff   ☑ Defendant   ☐ Other

**Title of Motion:** Unopposed Motion for Extention of Time      ☑ Attached   ☐ Previously Filed

**DATE TO BE HEARD:** 10/14/11      **Time Estimate** (combined no more than 30 mins): 5 minutes

**Time to be Heard:**   ☐ 9:00 a.m. with a Judge    ☑ 9:00 a.m. without a Judge

☐ 10:00 a.m. (Civil Action Cases) Does this motion require 2 weeks notice? ☐ Yes ☐ No

☐ 11:30 a.m. (DOMESTIC/Family Law Cases) Does this motion require 2 weeks notice? ☐ Yes ☐ No

**Case continued from:** _____   **continued to:** _____
                 (Date)                                        (Date)

**Moving party will use** *Court Call* **telephonic appearance:**   ☐ Yes   ☑ No

**Judge** _____ must hear this motion because (check one reason below):

☐ The matter is on the docket for presentation of an order reflecting a specific ruling previously made by that Judge.

☐ This Judge has been assigned to this entire case by the Chief Judge; or,

☐ The Judge has advised counsel that all future motions, or this specific motion, should be placed on this Judge's Docket; or,

☐ This matter concerns a demurrer filed in a case where that Judge previously granted a demurrer in favor of demurrant.

**PRAECIPE by:** David E. Carney/Computer Sciences Corporation    Skadden, Arps, Slate, Meagher & Flop LLP
               Printed Attorney Name/ Moving Party Name                  Firm Name

1440 New York Avenue, NW; Washington, DC 20008
                          Address

| (202) 371-7000 | (202) 393-5760 | 43914 | david.carney@skadden.com |
|---|---|---|---|
| Tel. No. | Fax No. | VSB No. | E-Mail Address (optional) |

### CERTIFICATIONS

I certify that I have in good faith conferred or attempted to confer with other affected parties in an effort to resolve the subject of the motion without Court action, pursuant to Rule 4:15(b) of the Rules of the Supreme Court of Virginia; and, I have read, and complied with, each of the Instructions for Moving Party on the reverse side of this form.

_____
Moving Party/Counsel of Record

### CERTIFICATE OF SERVICE

I certify on the 7th day of October , 2011 , a true copy of the foregoing Praecipe was

☐ mailed ☑ faxed ☐ delivered to all counsel of record pursuant to the provisions of Rule 4:15(e) of the Rules of the Supreme Court of Virginia.

_____
Moving Party/Counsel of Record

CCR-E-10 (April 2010 version)

VIRGINIA:

IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

FILED
MOTIONS DOCKET
2011 OCT -7 PM 4: 03

JOHN T. FREY
CLERK. CIRCUIT COURT
FAIRFAX, VA

CHE WU HUNG, derivatively, on behalf of )
COMPUTER SCIENCES CORPORATION, )
               Plaintiff, )
                                          )
                  v. ) CL 2011-13376
                                            )
MICHAEL W. LAPHEN, MICHAEL J. )
MANCUSO, DAVID J. BARRAM, STEPHEN )
L. BAUM, ERIK BRYNJOLFSSON, )
RODNEY F. CHASE AND THOMAS H. )
PATRICK, )
                                            )
                    Defendants, )
                                            )
    - and - )
                                            )
COMPUTER SCIENCES CORPORATION, )
                Nominal Defendant. )

## ENTRY OF APPEARANCE

**TO THE CLERK OF THIS COURT AND ALL PARTIES OF RECORD:**

       Please enter my appearance as counsel in this case for Nominal Defendant

Computer Sciences Corporation.

       I certify that I am admitted to practice in this court.

Dated: October 7, 2011

                             Respectfully submitted,

                             David E. Carney (Va. Bar No. 43914)
                             *Counsel for Nominal Defendant Computer*
                             *Sciences Corporation*
                             Skadden, Arps, Slate, Meagher & Flom LLP
                             1440 New York Avenue, NW
                             Washington, DC 20005
                             Telephone: (202) 371-7000
                             Facsimile: (202) 393-5760
                             David.Carney@skadden.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2011, I served a copy of the foregoing by facsimile on the following:

Robert Wilson
Eugene Benick
FINKELSTEIN THOMPSON LLP
Suite 150
1077 30th Street NW
Washington, DC 20007
Fax: 202.337.8090

Robert C. Schubert
William F. Jonckheer
Miranda P. Kolbe
SCHUBERT JONCKHEER & KOLBE LLP
Suite 1650
Three Embarcadero Center
San Francisco, CA 94114
Fax: 415.788.0161

David E. Carney

VIRGINIA:

## IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

|  |  |
|---|---|
| CHE WU HUNG, derivatively, on behalf of<br>COMPUTER SCIENCES CORPORATION,<br><div align="center">Plaintiff,</div> | )<br>)<br>)<br>) |
| <div align="center">v.</div> | ) CL 2011-13376 |
| MICHAEL W. LAPHEN, MICHAEL J.<br>MANCUSO, DAVID J. BARRAM, STEPHEN<br>L. BAUM, ERIK BRYNJOLFSSON,<br>RODNEY F. CHASE AND THOMAS H.<br>PATRICK, | )<br>)<br>)<br>)<br>)<br>) |
| <div align="center">Defendants,</div> | )<br>) |
| <div align="center">- and -</div> | )<br>) |
| COMPUTER SCIENCES CORPORATION,<br><div align="center">Nominal Defendant.</div> | )<br>) |

### AGREED ORDER

CAME NOW Nominal Defendant Computer Sciences Corporation ("CSC"), with the

consent of Plaintiff Che Wu Hung, upon Unopposed Motion For Extension Of Time For

Computer Sciences Corporation To File Its Motion, Answer Or Other Responsive Pleading (the

"Motion").[1] For good cause shown, it is hereby ORDERED as follows:

1.      The deadline for Nominal Defendant CSC and Defendants Michael W. Laphen,

Michael J. Mancuso, David J. Barram, Stephen L. Baum, Erik Brynjolfsson, Rodney F. Chase

and Thomas H. Patrick to move, demur, answer or otherwise respond to the September 13, 2011

Complaint, shall be extended from Monday, October 17, 2011, to Thursday, December 1, 2011.

---

[1]   Defendants Michael W. Laphen, Michael J. Mancuso, David J. Barram, Stephen L. Baum,
Erik Brynjolfsson, Rodney F. Chase and Thomas H. Patrick have not yet been served with
the Complaint, but consent to the relief requested in the Motion.

2.      The relief granted in this order impacts only the time for Nominal Defendant CSC and Defendants to move, demur, answer or otherwise respond to the Complaint.  Plaintiff, Nominal Defendant CSC and Defendants have reserved all other rights.

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

David E. Carney (Va. Bar No. 43914)
*Counsel for Nominal Defendant Computer Sciences Corporation*
1440 New York Avenue, NW
Washington, DC  20005
Telephone:  (202) 371-7000
Facsimile:  (202) 393-5760
David.Carney@skadden.com

**DIMUROGINSBERG, P.C.**

Bernard J. DiMuro (Va. Bar No. 18784)
*Counsel for Michael W. Laphen, Michael J. Mancuso, David J. Barram, Stephen L. Baum, Erik Brynjolfsson, Rodney F. Chase and Thomas H. Patrick*
908 King Street, Suite 200
Alexandria, VA 22314
Telephone:  (703) 684-4333
Facsimile:  (703) 548-3181
bdimuro@dimuro.com

**FINKELSTEIN THOMPSON LLP**

Robert Wilson (Va. Bar No. 77791)
*Counsel to Plaintiff Che Wu Hung*
Suite 150
1077 30th Street NW
Washington, DC 20007
Telephone: (202) 337-2995
Facsimile: (202) 337-8090
Robert O. Wilson
rwilson@finkelsteinthompson.com

**SCHUBERT JONCKHEER & KOLBE LLP**

Robert C. Schubert
Willem F. Jonckheer
Miranda P. Kolbe
*Counsel to Plaintiff Che Wu Hung*
Suite 1650
Three Embarcadero Center
San Francisco, CA 94114
Telephone: (415) 788-4220
Facsimile: (415) 788-0161
wjonckheer@schubertlawfirm.com

DATED:   October 14, 2011
Fairfax, Virginia

IT IS SO ORDERED,

A COPY TESTE:
JOHN T. FREY, CLERK

BY:
Deputy Clerk
Date:
Original retained in the office of
the Clerk of the Circuit Court of
Fairfax County, Virginia

VIRGINIA:

## IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

CHE WU HUNG, derivatively, on behalf of ) 
COMPUTER SCIENCES CORPORATION, )
           )
        Plaintiff, )
           )
         v. )        CL 2011-13376
           )
MICHAEL W. LAPHEN, MICHAEL J. )
MANCUSO, DAVID J. BARRAM, STEPHEN )
L. BAUM, ERIK BRYNJOLFSSON, )
RODNEY F. CHASE AND THOMAS H. )
PATRICK, )
           )
       Defendants, )
           )
     - and - )
           )
COMPUTER SCIENCES CORPORATION, )
           )
       Nominal Defendant. )
_____ )

## PRAECIPE CORRECTING APPEARANCES OF COUNSEL

Nominal Defendant Computer Sciences Corporation ("CSC") and each of the individual

defendants, by counsel, hereby file this praecipe correcting the appearances of counsel.

On October 14, 2011, the parties filed with the Court a consent order regarding the time

in which CSC and all of the individual defendants may file responsive pleadings. In the consent

order, the signature lines of counsel for defendants incorrectly listed the representational status of

counsel. The following sets forth the correct representational status of counsel.

1

CSC and individual defendants Michael W. Laphen and Michael J. Mancuso are represented by:

David E. Carney (Va. Bar No. 43914)
Skadden, Arps, Slate, Meagher & From LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
David.Carney@skadden.com

The remaining individual defendants (i.e., David J. Barram, Stephen L. Baum, Erik Brynjolfsson, Rodney F. Chase and Thomas H. Patrick) are represented by:

Bernard J. DiMuro (Va. Bar No. 18784)
DiMuroGinsberg, P.C.
908 King Street, Suite 200
Alexandria, VA 22314
Telephone: (703) 684-4333
Facsimile: (703) 548-3181
bdimuro@dimuro.com

This correction does not in any way affect the consent order tendered to the Court and the terms of that Consent Order remain the agreement between the parties.

Respectfully submitted,

Defendants
By Counsel

Bernard J. DiMuro (Va. Bar No. 18784)
DiMuroGinsberg, P.C.
908 King Street, Suite 200
Alexandria, VA 22314
Telephone: (703) 684-4333
Facsimile: (703) 548-3181
bdimuro@dimuro.com

2

*David E. Carney* by B. D'Muro.
w/ permission (see attached)

David E. Carney (Va. Bar No. 43914)
*Counsel for Defendants Michael W. Laphen and Michael J. Mancuso and for Nominal*
*Defendant Computer Sciences Corporation*
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone:  (202) 371-7000
Facsimile:  (202) 393-5760
David.Carney@skadden.com

3

David E. Carney (Va. Bar No. 43914)
*Counsel for Defendants Michael W. Laphen*
*and Michael J. Mancuso and for Nominal*
*Defendant Computer Sciences Corporation*
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone:  (202) 371-7000
Facsimile:  (202) 393-5760
David.Carney@skadden.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was sent by first class postage prepaid mail this 24th day of October, 2011 to the following:

*email and BD*

Robert Wilson (Va. Bar No. 77791)
**FINKELSTEIN THOMPSON LLP**
Suite 150
1077 30th Street NW
Washington, DC 20007
Telephone:  (202) 337-2995
Facsimile:  (202) 337-8090
rwilson@finkelsteinthompson.com

Robert C. Schubert
Willem F. Jonckheer
Miranda P. Kolbe
**SCHUBERT JONCKHEER & KOLBE LLP**
Suite 1650
Three Embarcadero Center
San Francisco, CA  94114
Telephone:  (415) 788-4220
Facsimile:  (415) 788-0161
wjonckheer@schubertlawfirm.com
*Counsel to Plaintiff Che Wu Hung*

Bernard J. DiMuro

4